Thank you. As you noted, Your Honor, I'm Tom Marra, and may it please the Court and counsel, I'm representing the Perrys in this case, who are the plaintiff and appellants. Given the directive of Rule 34, I will try to do nothing more than clarify what I believe is already stated in the brief and that we have submitted to this Court and in the reply brief that we've submitted to this Court. I'd like to say that I think if one of the problems in this case is it's been difficult for both parties, as even acknowledged by NQI, to understand what exactly the Court did when it rendered its summary judgment in this case. The order is candidly very short of any specific facts and any specific law which would lead one to conclude what the basis was for the Court's determination. To me, it looks as though the judge felt as though he was the fact-finder and that he decided what facts were going to be considered and rendered his decision accordingly. And, indeed, I think it could be very readily argued that he weighed the evidence, which I think is completely inappropriate in a case such as this, particularly as noted where we're talking about scienter, the state of mind of these people. So your argument is that there are material questions of fact that couldn't be resolved on summary judgment? I think that there were material questions of fact that the Court didn't even address, and we have no idea, in looking at that order, what it was that brought into determination that he made. He didn't cite anything in the record. Either the luxury or the curse is that we have de novo review in this situation. So, in looking at this, our challenge is to figure out, is there a material issue of fact, in which case it would be reversed, or, given the state of the law, are there no material issues of fact? So, from you, it would be helpful to hear, kind of leaving aside the district court order, because you're right, he didn't necessarily specify. What do you think are the key is or are the key issues of fact? Well, and that's where I was going with my argument, is I think that there were really three substantial material facts in this case, which I think the Court utterly ignored, and that were discussed as being substantive by the Court in the Scherner case, which was the decision that was handed down by the Montana Supreme Court, which, in essence, said this is the new definition of actual malice that we are going to use from this point forward. And it lasted about five minutes, I gather. But you're within the five minutes that it lasted, is that right? No, it's been overruled by the legislature. Correct. Yes. And April 2001 was the end of those kinds of cases, as far as the legislature was concerned. The first one that the Court, I believe, ignored totally was the financial issue. That was an issue that was discussed in the Scherner case about the fact that the shutdown time of the Conoco plant, the financial losses incurred by Conoco, those are the kinds of things that the Court looked at and said, well, if those allegations were, in fact, true, that they set aside the safety concerns of their workers for the sole purpose of saving money by avoiding the shutdown time, that's indications of malice. And, in fact, we have exactly the same in this case that we did in that case. It's touched upon in the brief, but I'd like to expand upon it a little bit more here, if I may. The cars, the grain cars, where they are loaded, Burlington Northern Santa Fe Railroad drops those cars off at the grain elevators, and the grain company and the probers have 48 hours in which to probe those grain cars or face the consequences of what's called a demurrage charge of $50 a car. In this instance, it would have been over $2,600 for those cars to be on those tracks longer than the 48 hours. If you remember, it's unrebutted in the record that when Mr. Perry showed up to his first day of work, he gets a call. He rushes down there. He's never worked here before. The corporate representative, Mr. Allen, advises him that, look, we're really under the gun today. We've got to get going on this. So they send Mr. Perry out, as noted in the brief, with no training, no safety training, no protective equipment, in a rented van with no tools or anything. Okay. You're going to have to help me here. The district court's basic ruling was that your client's exclusive remedy was workers' time. Correct? Correct. Your contention is that your client's claim falls within an exception. Falls within the exception outlined by Scherner. For intentional act. Okay. So far, you've told us that it was, what, negligent to send an untrained person out? Well, intentionally send them out, as in the Conoco case. How do you intentionally? How do you, other than intentionally assign someone to a work detail? Well, you send, first of all, you should train them before you send them out. But that's not the case. That sounds like negligence. Right. But NQI could Are you talking about your client or the other gentleman? I'm talking about both of the people that were sent out, both in the Scherner case and in this instance. They were I don't care about the Scherner case if you're on this case. Right. Mr. Perry was sent out with no training, no safety equipment, no nothing, because they had to have a warm body on the site that day to get the job done in order to avoid the demerge charges on that train. They couldn't afford the What did he represent that he was knowledgeable in this area? He did not represent he was knowledgeable in the area. When, if you look at the record, what the testimony from the NQI people was, they didn't know what his background was. They assumed what his background was because he was a farmer. His experience consisted of being on top of a grain car once in 1974, which I don't think really makes you qualified to engage in probing. But in any event, Your Honor, to direct your question, just like in Scherner, they didn't want to have this financial loss. This was a company that was selling itself on the fact that it could get this job done quickly and inexpensively. Well, if you or your Something in the record where someone from NQI says we did this deliberately. It doesn't have to say that. And that's what It's malicious. It doesn't have to say that. Not under Section 221 and under the Scherner case, that's not the requirement. What it has to show is that there was an indifference or a deliberateness in failing to do the act itself. In other words, failing to train him because taking the time to train him and give him the appropriate protective and safety equipment would have been too expensive. And that's what the Court talked about in Scherner. But isn't the problem, now you're listening to me, because I thought the problem or the essence of your complaint was that the conditions present here were such that that caused a high likelihood of injury. That's correct. And that's the second aspect of the argument is, is that what the Court ignored here was, is that inherently dangerous, this was an inherently dangerous work activity as a matter of law. Working under these conditions without safety training, without the proper equipment was something that had a high probability of injury. And if you look at the statute, if you look at 221, it specifically talks about the high probability of injury. But you had, they had two people fall off a grain car out of 290,000 grain cars inspected. Well, they had five people fall off a grain car in 18 months out of a total of ten or 30 employees in the whole United States. So one-sixth of the people that work for you. Part of it they inspected over the course. But that, I mean, that's a, with all due respect, I understand the argument. The problem is, your argument is there's thousands of high-risk jobs in the United States, you know, people who hang off of windows, welders, that sort of thing. And so it can't be that the job is inherently risky because then you, the exception would follow the rule and workers come. There has to be something else. Well, there is. And that's the inherently dangerous nature of the work activity and the willingness to place the financial gain ahead of the worker's safety. And those are exactly the two issues that were discussed in the Scherner case. They sent, just like in Scherner, in this instance, they sent two workers into a job site, 20 below degree weather, wind, ice on top of a rail car, without any safety training. And just like in Scherner, somebody was injured as a result. The load in this instance, if he had been properly trained as they were required to have trained him, he would have known how to open the latches on the lids of the train. He would have known to have not even got on top of the train because he knew under the he would have known under their safety literature, which he was never provided, that this was such a hazardous condition, 20 below weather, frozen lids on top of the grain cars, that he would not have attempted to have done that. Now, your contention, I understand, is not that sending somebody to go on top of the grain cars is itself sufficiently inherently dangerous to give rise to a Scherner claim if somebody is hurt. It's because of the particular conditions and because of his lack of training. That's correct. That it was inherently dangerous, not just because of his probing grain cars. That's correct. And the motivation for doing so adds to the malice. That's an important element of the malice. Why did they choose to do that? That's secondary. Aren't there two issues? One is, is it inherently dangerous? And the second one is, what was their frame of mind with regard to this inherently dangerous thing? That's correct. So there are basically two problems. And the problem we're having is really with the inherently dangerous part. What did they have this frame of mind about? What they had the frame of mind about was they didn't care that it was dangerous. They knew it was dangerous because all of their literature suggested that it was dangerous. But what I'm at least probing and what I think Judge McKeon was probing is that this whole activity is dangerous. Going on top of a grain car and probing is dangerous. Climbing a bridge is dangerous. It can't be that there's a workers' comp exception whenever an employer sends you off to do a dangerous job. So what is there special about these circumstances that would give rise to the possibility of coming within the exception? Just as the insurer, they should have anticipated, they should have known because they knew that this was such an ultra-hazardous situation, just like insurer. Because of the conditions. Because of the conditions and the fact that this man had no tools, no training and no nothing. I think we've heard your argument, understand it. You're substantially over your time. Thank you for your argument. We'll hear from the other side at this time. Mr. Sharkey. Thank you, Your Honor. May it please the Court, this case is not a Scherner case at all. I think the Court has hit the nail on the head here. This case involves nothing more than issues of negligence. And negligence does not take the case outside the exclusive remedy provisions of the workers' compensation. Let's take somebody whose job is climbing a bridge to work on it or something like that. The job is dangerous. The exception can't apply just for that reason. But suppose they sent somebody. Suppose they had sent me up, you know, to string some wire on a San Francisco Bay bridge. Would that not be an inherently dangerous thing to do and possibly malicious and possibly come with insurance? Well, I'm not sure what conditions a person would be working under when sent up to work on a bridge, to paint a bridge. I would suspect that you're excused. They just send me up to paint the bridge under any conditions. And I don't know anything. I've just never done anything like this. Well, I think that may be different. But that's exactly what he's claiming here. So isn't it a record problem? And the issue is, what does the record show? He's showing that they sent him to do a very dangerous thing in very dangerous conditions and he knew nothing. I don't agree that they sent him to do a very dangerous thing in very dangerous conditions. Well, let's start with the first half of that. Have you ever climbed on a railroad car? Have I? No, Your Honor. I have. In 70-degree weather with no wind. And it's dangerous. Well, I agree. It certainly can be dangerous, Your Honor, if a person is not careful, much like walking across a busy street. It can be dangerous. Well, it's dangerous because you don't know what's going to happen if they're putting other cars down sightings and maybe you're working at night, you can't see, that sort of thing. I mean, and they're not the most stable conveyances in the world. But given that, it's not an undangerous task to get up on top of a railroad car. Oh, I certainly agree with that. And in this instance, there was two or three inches of snow on the ground. It was what? Below zero? Below freezing? Below freezing, Your Honor. And the wind was blowing? But there was some wind, but the plaintiff, Scott Perry himself, testified that he was located behind the elevator, which was blocking the wind. The wind was not a factor in this accident. The snow was not a factor in this accident. Ice was not a factor in this accident. Well, I thought that he fell when he was having difficulty prying open a lid that was frozen shut. That's correct. So the ice had something to do with it. So the temperature had something to do with it. Well, the ConAgra manager, manager of the elevator, testified that these lids on these cars can stick for any reason. They stick in the summertime. They stick in the wintertime. They stick in the summer when it gets too hot. The lids expand. They expand. And they can become stuck even in the summertime. But this one stuck because it was frozen. That's correct. So there was a connection with the conditions. Well, he, what happened to him is, yes, it was frozen shut. And he grabbed on the handles and he yanked two or three times. What did the records show precisely? Because this is where the briefs are night and day, about what his prior experience, in fact, was and what the company knew about his prior experience. His prior experience was that this gentleman was about 45 years of age when he took the job with National Quality Inspection. In January of 1999, he had spent his entire life on farms. He grew up on a farm. He worked on, he had worked on tops of bins, grain bins. He had worked, he had probed grain out of a rail car on at least one occasion. More than once 20 years ago? Pardon me? More than once 20 years ago? Is that not true, that it was once 20 years ago? The representation is that he did it once 20 years ago. I'm not sure what the record says about the precise date that he did it, Your Honor. The company has a very elaborate training program, which he did not do. Is that right? The company has an elaborate training program, which, and he had none of it. I don't know that it has an elaborate training program. What the. It has a training program. It has a training program, yes. And I think there was some testimony that they do like to, with a new employee, excuse me, not an inexperienced one, with a new employee, they do like to take them out and show them how to do this. But the testimony. Some 30-day training program with a certification at the end and things like that. I'm sorry, Your Honor. I'm sorry if I'm not being clear. I thought they had a 30-day training program with a certification of some sort at the end. The certification was to become a laboratory technician to actually grade the samples of the grain when they came into the laboratory. That's the 30-day program. But it's not a 30-day program to teach someone how to sample grain, get up on top of the rail cars and sample the grain. That can be done in far less time than 30 days. And in this case, Corey Allen, who was the logistics coordinator for National Quality, testified that part of the reason that he decided to send Scott Perry out there that day was based upon his vast experience with grains and his farming experience. He'd been on top of it. But in fact, he did not have vast experience or hardly any experience with this particular task. He had probed grain before. He had been on top of rail cars before. I guess I don't know that I would say I would agree with you that his experience probing grain may not necessarily have been vast, but he did have experience. He did know what he was doing. But the particular problem, for example, was opening these caskets, and there was no reason to think he had experience or maybe any experience, but certainly not more experience than once 20 years ago with that particular project. Well, the amount of experience that he did have, I'm not sure. And I don't know that the record is all that clear, other than the fact that he was born and raised on a farm and he worked on farms his entire life for 45 years. Doesn't it really come down to them knowing, you know, whether there was some kind of malice or deliberate indifference given the conditions and given the individuals involved? Is that the issue they have to answer? Yes. Did they send him out there intentionally knowing that the conditions created a high probability of injury to him? Now, they didn't. There was no one who went out there and looked at the conditions. I thought that what the Montana Supreme Court had said was that the burden here was to show knowledge of facts or intentional disregard of facts that create a high probability. No, Your Honor. Knowledge. First, you must show knowledge of facts that create a high probability of injury. Next, you must show that the defendant proceeded to act in the face of those facts. Deliberately proceeded to act. Yes. In conscious or intentional disregard. Disregard or indifference. High probability. Or indifference to the high probability. And wasn't there – this is a summary judgment case. Yes. Isn't there evidence in the record that one of the supervisors said this didn't feel good to him when he sent the guy out? That's the testimony of the plaintiff, Scott Perry. It's a great judgment. Okay. He says that, yes, yes, Your Honor. He did in his testimony or an affidavit, I believe, Scott Perry did say that Corey Allen told him when he sent him out, I don't feel good about this. Okay. And that's the only thing there isn't? That's the only thing that's more indicative of the frame of mind that Scherner suggests. No, I don't think so, Your Honor. I don't agree with that. Okay. Thank you for your argument. Thank you. Thank you both sides for their argument. The case just argued will be submitted for decision. And we'll proceed to the next case on the calendar, which is the United States v. Wilkinson, Sanchez and Longhi. Thank you. Thank you, Your Honor. You're Mr. Donahoe? I am, Judge. Good morning. Do you have an opponent here? I do. He's right there. Okay. All right. Recognize him from yesterday. And I've recognized him for many years. Okay. If it pleases the Court, my name is Michael Donahoe. I am here on behalf of these defendants on a supervised release issue. I'd like to acknowledge that I'm here on a plain error standard, at least with respect to two of the defendants. And I understand that that burden is substantial. But I did want to comment in relation to that burden that in the record, Judge Lovell was quite explicit. I think it was the Longhi case, and it appears in his excerpts at page 26, where the judge indicates that he had had a series of these cases. This represents the series. He, in his own mind, had some questions about the propriety of levying these sentences and urged us to bring this matter to the Court for clarification. And I think that has some bearing on the plain error standard. He did say that, but what was it that he wanted to be clarified? Well, Judge, actually, I'm not certain. I think he had some reservations, and I've looked at that colloquy carefully, about whether or not he had only, like it was an all-or-nothing proposition. The judge, I think, indicated that he felt maybe under the Plunkett decision, and he had used that decision, I think, when he spoke, he could sentence within the policy, the Chapter 7 policy range, or in the alternative, go up to the statutory maximum in 3583, which in this case was 24 months, based on the original conviction that each defendant had suffered. But I don't know that I necessarily thought that was a problem, and I think I want to confess that to the panel. I don't know that there's a problem with the judge making an honest assessment of the policy statement and saying that range is not high enough, it's not good enough, which this judge did in this instance, and in, I think, each of these instances. I don't think he's bound by statute to say, well, therefore, I'm completely wired in to 3583, and I must impose the maximum. So if that was his orientation, I don't know that there's a problem, in other words, with saying if the policy range is 4 to 10 months, the statutory maximum is 24 months. I don't think there's a problem with that.    I don't think there's a problem with the judge saying, well, therefore, I must impose 23 months. Well, I don't think there's a problem with coming somewhere in between there, in other words, saying, well, I think the sentence in this instance should be 16 months and this instance should be 18 months. And so at that point, you're on board with the judge, at least theoretically. I am, Your Honor. But what turned out to be the problem was, though, he decided to go ahead and impose the statutory maximum and then do this departure downward. And that was of concern to me. That's not a departure downward for the very reason that you just said. That is because there is, in fact, no guideline on this at all. There's a statutory maximum. There's a policy standard. If he doesn't adopt the policy standard, then he can go anywhere else in the statutory maximum. There's no – there is no downward departure. And it may just turn out to be a poor choice of words. And I might even be willing to admit that. But I think what I'm here today on and what I do want to stress in my remaining time is this notice issue. I'm sure the Court is aware that 3583 has undergone a revision now in April, and some of the language has been deleted from, I think, a sentence or a phrase from subsection H. And in the Sanchez matter, my ultimate objection, which I am not here on a plain error standard, was that defendants should be notified at their arraignment – there's a notice and due process issue here concerning how is this supervised release going to work. Now, I've racked my brain about this, and I can't tell the Court how this is working in courts throughout our circuit. But it seems to me that the way that this is working now is there can be perpetual supervised release that could certainly extend beyond even the statutory maximum for the underlying crime. You could, and we have had cases so indicating, but we're not up to that here, right? Well, I think we are up to that based on this objection. Sanchez – May I ask, just to get clear, are you arguing specifically now only on Sanchez? Or are you arguing in general on a due process objection? Well, I'm arguing that same – And let me tell you why my question, because I didn't think the briefs really laid out a due process argument and made those arguments. So if that's the case, does Sanchez have something else I should look at? Well, I understand that the briefs were brief. But – And the briefs said the word due process and nothing else about it. Well, but I did say at the end of the brief that there could be a perpetual imposition of sentence in these supervised release revocation proceedings, and that that was anathema to the whole purpose of the guidelines, to make everything certain and to make it structured. This is a completely unstructured sentencing orientation. But could any of these three defendants, and Sanchez in particular, go beyond what would have been the supervised release available in the original sentence? No. So, therefore, the problem that you're pointing to, although it may exist, is simply not an issue here. Well, I think it is in that if the defendant in a given case, let's take Sanchez, is back before the court for revocation and facing a situation where she is going to have her supervised release revoked and have more supervised release imposed, she's reached that threshold point where she was not – she didn't have that understanding when she either pled guilty or was convicted. She didn't have that understanding at the arraignment. But that certainly you didn't raise, right? I mean, that's back then. But that's actually the notice problem. That would be the remedy to either say, if that's the way this is going to be. But if that's the way, Your Honor, that's supposed to work, that's the notice that she should have. Okay. So – and I don't want to – you know, I don't want to sound like I'm nitpicking because I'm not, but we have – we always have a dilemma in these cases where there are multiple arguments and people make an argument in passing. And the notice argument on which your argument now is predicated, it seemed to me was – I don't want to call it a throwaway. I think it was a thoughtful statement. But it didn't seem to me just making a statement in the brief without any kind of flushing out or at least the citation to some authority really meets with our rules. Now, maybe you have a response to that as to why we ought to consider the due process argument. But that's what concerned me. Well, and I don't know that I have anything other than an admission there. And it's not – to go on with that, it's not simply that it's not in the brief. It's also that you just made an argument that depends upon whether or not she was notified of the maximum penalty, which would have meant back when she was originally sentenced. So we don't even have that record. We don't know if she was notified or wasn't notified. But in the brief, it says that the defendants are entitled as a matter of due process to be notified of the maximum penalty applicable to the given defense. Does it say that – does it point to anything in the record that shows that she wasn't? Was, or anything else about the original sentencing? But that was the objection that was made at the time. At the time of the sentencing on the revocation. Correct. So your argument depends on what she was told when she was originally sentenced, which we don't even know. And that's right. But I made the objection at the revocation, Judge, and – or, Your Honor, and – But you're not now telling us. You don't have anything in the record to tell us about what happened in the original sentencing. But it would be Judge Lovell's determination whether or not to explore that objection. He just clearly overruled it. You have no obligation to come forward and make some showing of facts about whatever it is you're complaining about? Well, Judge, in my own defense, I mean, at that point in time, revocations are brief proceedings. They're generally uncomplicated on their facts. This legal issue came up in these terms. I made the due process notice issue. I think Judge Lovell understood it. He squarely rejected it. There was no occasion for me to bring forward any evidence. I think that would have been insipid on my part. He understood what I was saying, that they were entitled to notice of the maximum penalty. We could have gone back and checked that record as a matter of fact. He's saying, even if you're right, I think, by overruling the objection, I don't buy the argument. So to let this rise and fall on my performance in not bringing forward evidence, respectfully, Judge, I think that's short-sighted. Do you want to save any time for rebuttal? No, Your Honor, I don't. I'm finished. Thank you. Unless there are other questions. I don't see any more. Thank you very much for coming in today and for your argument. Mr. Hubley? Welcome back. Good morning. I'm going to start with the last argument first, and I think that the Court's radar is on here. I'd ask you to look at this from my standpoint. I just heard a due process argument here, and it's hard for me to rebut it, especially because it sounds to me like we have an argument here that is made for the first time, and quite frankly, it's somewhat surprising. And I agree with you, Judge, there's nothing in the record that I can point to to say the person was advised, the person was advised, I'm comfortable that this person was advised of the maximum statutory penalty and the maximum term of supervised release. So assuming that that is the fact, there's no due process violation even at the revocation stage. At least at this point. And it is conceptually possible that this person could be back in prison, back on supervised release, get the supervised release revoked again, and end up with a nuisance that would bring either the imprisonment or the statutory release beyond the statutory maximum, right? But is that issue before the Court? No. I believe, Mr. Donahoe, I don't have the record here that shows he made the due process notice objection in the district court, but I believe him that he did, although he didn't cite it in that part of his argument here. I'm not sure if that's really enough, however, you know, to give you notice, because obviously this isn't addressed even in the red brief by the government, because it's a passing reference. That's exactly right. And I think we didn't even have a target to shoot at, so to speak, in terms of arguing backwards.   And that's all we can say in response to his due process argument, is, as you noticed in our brief, the defendant is devout to sentence and no authority to the suggestion that the venerated constitutional principle of due process was violated when the Court did not notify them of the maximum possible penalty. That's all I have to – and that's all we can say in response to his due process argument. And quite frankly, we can't rebut something when we don't know really what the argument is. And for the first time now here, it seems like he's elaborated on that and says, well, Sanchez at least must not have been advised of everything potentially at the change of plea hearing. Well, that's not before the Court, and I think we should leave it. And it's also true that she's not beyond her statutory maximum yet either. Absolutely. That's absolutely correct. I think on its face here, the facts and the issues that are presently before the case is simply, was the defendant sentenced within the statutory maximum of 24 months? The answer is yes. Was each defendant, in my last comment, each defendant sentenced to something below or no more than the maximum supervised release period allowed? And the answer is correct, that each one of them was sentenced within the 36 months. Actually, Sanchez could have been sentenced within 60 months because her supervised release being a drug case was 60 months as opposed to 36. That being said, the most that was imposed here is 36 months, so there's no violation whatsoever of any supervised release or maximum penalty. Consequently, I think that the argument that was the reason why the judge chose the precise amount of time was because the sentence, the statute very oddly seems to say that if you sentence somebody to the maximum supervised release, they can't get more supervised release, but if you sentence them to one month less, then they can't. So he basically chose it to be sure they'd get more supervised release later. In terms of incarceration, yes, I think you've misspoken in terms of supervised release. Yes, the statute says the statute says if you sentence to the maximum, it's over, no more supervised release. If you sentence to less than the maximum authorized, and in this case, a Class C felony and a maximum of 24 months, if you sentence to less than that, you may impose supervised release. And I believe that the judge very clearly articulated why he wanted supervised release in addition to a less-than-maximum sentence in this case, consistent with what the Supreme Court said in Johnson as for the reasons. Therefore, I think both the spirit and the letter of the law, contrary to the defendant's arguments, were followed. The Court very clearly articulated a sentence of less than the maximum, and I agree, Judge, that there is no downward departure here. I think that was just simply an inartful way to express the fact that he was sentencing to less than the maximum in a statutory period. Now, the only thing that's a little odd is that 3553 includes factors to be considered, right, one of which is the kinds of sentences available. Right. And then 3583, factors to be considered including the term of supervised release, includes all the – most of the sections of 3553, but not the kinds of sentences available. So for some reason, leading to the question of is there some – does that suggest that in deciding on – that he couldn't take into account the kinds of sentences available, i.e., whether supervised release was going to be available or not? I think he did. I think he took into account everything from the policy statement, guideline provisions, to the original guideline sentence, to the statutory provisions in 3553 and 3583, and crafted a sentence that he believed would be appropriate for each sentence – for each defendant's sentence, namely, one of incarceration plus supervised release. So whether it said it or not, it seems to me that he went ahead and did it. So I think there's no harm, no foul. I don't know what more than I – that I can say about this. I think I'll conclude by saying that 3583H carries the day in terms of the way the sentence is to be calculated. The judge did exactly what subsection H said he should and had to do, and therefore, I find no error whatsoever and would submit that there is no error, plain or otherwise, in this case. Thank you. Thank you for your argument, counsel. Thank both sides for the argument. The case just argued will be submitted for decision.
judges: Hawkins, McKeown, Berzon